## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DAKITA P.,

                   Claimant,

       v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

                 Respondent.

No. 20 CV 7126

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

Claimant Dakita P.[1] ("Claimant") seeks review of the final decision of Respondent Kilolo Kijakazi,[2] Acting Commissioner of Social Security ("Commissioner"), denying her application for a period of disability and disability insurance benefits under Title II of the Social Security Act and supplemental security income under Title XVI of the Social Security Act. Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties consented to the exercise of jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [ECF No. 7]. This Court, therefore, has jurisdiction pursuant to 42 U.S.C. § 405(g). The parties

---

[1] Pursuant to Northern District of Illinois Local Rule 8.1 and Internal Operating Procedure 22, the Court will identify the non-government party by using his or her full first name and the first initial of the last name.

[2] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Acting Commissioner Kijakazi as the named defendant.

filed motions for summary judgment. *See* [ECF Nos. 17, 23, 26]. This matter is fully briefed and ripe for decision.

For the reasons discussed in this Memorandum Opinion and Order, Claimant's Motion for Summary Remand [ECF No. 17] is denied, and the Commissioner's Motion for Summary Judgment [ECF No. 23] is granted.

## PROCEDURAL HISTORY

On January 29, 2018, Claimant filed a Title II application for a period of disability and disability insurance benefits. (R.15). Claimant also filed a Title XVI application for supplemental security income on the next day (January 30, 2018). (R.15). In both applications, Claimant alleged a disability beginning on March 16, 2017. (R.15).[3] The applications were denied initially on June 7, 2018, and again on reconsideration on October 16, 2018, after which Claimant requested a hearing before an administrative law judge ("ALJ"). (R.15). On December 5, 2019, Claimant appeared and testified at a hearing before ALJ Patricia Witkowski Supergan. (R.15). Claimant was represented by counsel at the hearing. (R.15, R.119). During the hearing, the ALJ also heard testimony from Ricardo Buitrago, Psy.D., a medical expert, and Chrisann Schiro Geist, a vocational expert. (R.15).

On January 15, 2020, the ALJ issued her decision denying Claimant's applications for a period of disability and disability insurance benefits and for supplemental security income. (R.15-27). The ALJ followed the five-step evaluation

---

[3] Claimant's previous claim for disability benefits was denied on March 15, 2017. [ECF No. 23] at 2 (citing R.156).

process required by the Social Security Regulations to determine if an individual is disabled. *See* 20 C.F.R. § 416.920(a). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since March 16, 2017, the application date. (R.17). At step two, the ALJ found that Claimant had the following severe impairments: lymphomatoid papulosis with recurrent lesions; depression and personality disorder (20 CFR 416.920(c)). (R.17). The ALJ also concluded Claimant's other impairments (pulmonary nodules, hemorrhoids, carpal tunnel syndrome, and low body weight) were not severe. (R.18).

At step three, the ALJ found that although Claimant has severe impairments, these impairments did not individually or in combination meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)). (R.18-19). The ALJ found Claimant's mental impairments, considered singly and in combination, did not meet or equal the criteria of listings 12.04 and 12.08. (R.18). In making that finding, the ALJ considered and concluded that Claimant did not meet the paragraph B criteria. (R.18-19). The ALJ also considered whether the "paragraph C" criteria were satisfied and concluded the evidence fails to establish the presence of "paragraph C" criteria such as the need for a highly structured setting or minimal capacity to adapt to changes. (R.19).

Before proceeding from step three to step four, the ALJ assessed Claimant's residual functional capacity ("RFC"). 20 C.F.R. § 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The ALJ concluded:

> "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; can tolerate occasional exposure to and/or work around extreme cold and heat and humidity. She can perform work that involves simple routine tasks requiring no more than short, simple instructions and simple work-related decision making with few workplace changes."

(R.19). At step four, the ALJ determined that Claimant had past relevant work as a manicurist, a semi-skilled and sedentary job. (R.25). However, as the Claimant was limited to unskilled work, the ALJ concluded Claimant was unable to perform past relevant work. (R.25). At step five, the ALJ considered Claimant's age, education, work experience, and residual functional capacity, and concluded that there are jobs that existed in significant numbers in the national economy that Claimant can perform, including based on the testimony of the vocational expert that Claimant would be able perform certain representative occupations that are available nationally (housekeeper and packer). (R.25-26). For all of these reasons, the ALJ found Claimant has not been under a disability, as defined in the Social Security Act, since March 16, 2017, the date her application was filed. (R.26).

The Appeals Council declined to review the matter on August 21, 2020, making the ALJ's decision the final decision of the Commissioner. (R.1-6). Therefore, this Court now has jurisdiction to review this matter. 42 U.S.C. § 405(g); *Smith v. Berryhill,* 139 S. Ct. 1765, 1775 (2019); *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## STANDARD OF REVIEW[4]

When a claimant files an application for disability benefits, he or she bears the burden under the Social Security Act of bringing forth evidence that proves his or her impairments are so severe that they prevent the performance of any substantial gainful activity. 42 U.S.C. § 423(d)(5)(A); *see Bowen v. Yuckert*, 482 U.S. 137, 147–48 (1987) (citing 42 U.S.C. § 423(d)(1)(A)). A five-step inquiry controls whether an individual is eligible for disability benefits under the Social Security Act, which the Seventh Circuit has summarized as follows:

> The ALJ must consider whether: (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy."

*Butler v. Kijakazi,* 4 F.4th 498, 501 (7th Cir. 2021) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir. 2005); 20 C.F.R. §§ 404.1520, 416.920). Claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five. *Gedatus v. Saul,* 994 F.3d 893, 898 (7th Cir. 2021); *Wilder v. Kijakazi,* 22 F.4th 644 (7th Cir. 2022).

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Judicial review is limited to determining whether the ALJ's decision is supported by

---

[4] The regulations governing disability determinations for benefits under Title II and Title XVI are identical in virtually all relevant respects unless otherwise noted.

substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching his or her decision. *See Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Substantial evidence "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (internal quotations omitted); *see also* 42 U.S.C. § 405(g); *Fowlkes v. Kijakazi*, 2021 WL 5191346, at *2 (7th Cir. 2021). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct. at 1154. Even when there is adequate evidence in the record to support the ALJ's decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (internal quotations omitted). In other words, if the ALJ's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008) (internal quotations omitted). The reviewing court may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v.*

6

*Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *see also Gribben v. Kijakazi,* 2022 WL 59404, at *2 (7th Cir. 2022) ("We do not reweigh the evidence or resolve conflicts in it."). "[O]nly if the record compels a contrary result" will the court reverse the ALJ's decision. *Fowlkes*, 2021 WL 5191346, at *2 (quoting *Borovsky v. Holder*, 612 F.3d 917, 921 (7th Cir. 2010)).

## ANALYSIS

Claimant argues the ALJ's decision cannot stand in this case because: (1) the ALJ's assessment of the physical limitations related to her lymphomatoid papulosis in Claimant's RFC was not adequately supported by substantial evidence; (2) the ALJ erred in finding a testifying medical expert's opinion persuasive as to the mental limitations in Claimant's RFC.

At the outset of the Court's review, it is important to note the Court's role in this case is not to determine from scratch whether or not Claimant is disabled and entitled to disability insurance benefits and supplemental security income. Instead, as set forth above, the law mandates that the Court's review of the ALJ's findings is deferential, and the Court only must determine whether the ALJ applied the correct legal standard and whether the ALJ's decision is supported by substantial evidence. *See Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). This Court cannot consider the facts anew or draw its own conclusion. Rather, if substantial evidence supports the ALJ's factual findings, those findings are conclusive, and the Commissioner's decision must be affirmed. 42 U.S.C. § 405(g).

The Court addresses Claimant's arguments below.

**A) The ALJ's assessment of Claimant's physical limitations related to her lymphomatoid papulosis was adequately supported by substantial evidence.**

Claimant first argues that the ALJ failed to explain how "degrees of exertional, postural, and environmental limitations she assessed in the RFC could account for [Claimant's] lesions, the debilitating pain they cause, or the care they logically require" and this failure to explain the basis for the physical limitations included in the RFC is sufficient to warrant remand. [ECF No. 17] at 10. In response, the Commissioner contends the ALJ was entitled to rely on the state agency assessments that Claimant's condition "were non-severe impairments that caused no functional limitations at all." [ECF No. 23] at 3-5.

As an initial matter, the Commissioner fails to address the ALJ's finding that Claimant's lymphomatoid papulosis was a "severe impairment" that "significantly limit[s] the ability to perform basic work activities." (R.17); *see also Million v. Astrue*, 260 F. App'x 918, 922 (7th Cir. 2008). Having identified this condition as a severe impairment, the ALJ was obligated to identify the limitations she included in the RFC to account for Claimant's lymphomatoid papulosis and explain how those limitations accommodate the symptoms of that condition. "A finding that an impairment is severe cannot square with a conclusion that it imposes no limitations. It is axiomatic that a severe impairment imposes limitations, and an impairment that imposes no limitations is not severe." *See Rogelio C. v. Kijakazi*, No. 22-CV-4077, 2023 WL 1779816, at *3 (N.D. Ill. Feb. 6, 2023) (internal citations omitted) (ALJ failed to address accommodations for claimant's severe obesity in RFC). [ECF No. 17] at 10.

Claimant also argues the Commissioner's reliance on the state agency assessments to defend the ALJ's RFC violates the *Chenery* doctrine, which precludes the government from defending agency decisions on grounds the agency did not invoke. [ECF No. 26] at 2. The ALJ stated "[t]he State agency consultants opined that [Claimant's] impairments are nonsevere" and "[t]his is somewhat persuasive." (R. 25). This statement, which referenced Claimant's impairments in the plural, suggests the ALJ found the assessments somewhat persuasive as to both Claimant's lymphomatoid papulosis as well as her mental health. But the ALJ does not provide any explanation of which parts of the state assessments she found somewhat persuasive with respect to Claimant's lymphomatoid papulosis.

Moreover, the ALJ's "somewhat persuasive" finding immediately followed the discussion of the independent medical expert's evaluation of Claimant's mental health, which the ALJ concluded was "better supported" than the state assessments. (R.25). The ALJ then addressed Claimant's lymphomatoid papulosis in the following paragraph, but did not discuss the state assessments. (R. 25). Thus, the ALJ's "somewhat persuasive" finding appears to primarily relate to the state assessments of Claimant's mental health. Based on this record, at a minimum, the Court concludes the ALJ did not adequately explain how she considered the state assessments of Claimant's lymphomatoid papulosis. Thus, the Commissioner is precluded from

arguing those assessments supported the ALJ's RFC related to Claimant's lymphomatoid papulosis.[5]

Turning to the physical limitations the ALJ included in the RFC, the ALJ found the medical evidence regarding Claimant's lymphomatoid papulosis "supports . . . reduced light level limitations" and "further limitations are not supported." (R.22; R.19 (including a "light work" limitation)). Social Security regulations provide that "light work" generally involves limits on lifting and carrying. *See Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022) (noting "the parties agreed that the primary and relevant difference between light work and medium work is the lifting and carrying weight requirements" and focusing analysis on claimant's lifting and carrying abilities where ALJ had found claimant could perform work at a medium exertional level, citing 20 C.F.R. § 404.1567(b) and (c)). But the ALJ did not explain how lifting and carrying limitations would accommodate Claimant's symptoms of lymphomatoid papulosis. The ALJ also included postural limitations that Claimant could "occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; [and] occasionally balance, stoop, kneel, crouch or crawl." (R.19). Again, there is no express connection drawn between these limitations and Claimant's symptoms. In addition, the ALJ included environmental limitations that Claimant "can tolerate occasional exposure to and/or work around extreme cold and heat and humidity." (R.19). Although Claimant testified her lesions are usually worse in the summer,

---

[5] In any event, as the state assessments do not find any functional limitations from Claimant's condition, it appears they would not support the specific limitations the ALJ did include in the RFC.

[ECF No. 17] at 5, the ALJ did not address that testimony or discuss any other evidence regarding Claimant's sensitivity to extreme temperatures. Given the limited explanation provided by the ALJ, the Court would be forced to speculate as to why the ALJ may have thought the included limitations adequately addressed the symptoms of Claimant's lymphomatoid papulosis.

The ALJ failure to explain how she arrived at the limitations included in the RFC assessment for Claimant's lymphomatoid papulosis could be a sufficient basis to remand. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) ("contrary to SSR 96-8p, however, the ALJ did not explain how he arrived at these conclusions; this omission in itself is sufficient to warrant reversal of the ALJ's decision."); [ECF No. 17] at 10. Nevertheless, the Seventh Circuit has instructed that courts "may affirm an ALJ's decision that does not conform with SSR 96-8p's requirements if we are satisfied that the ALJ 'buil[t] an accurate and logical bridge from the evidence to her conclusion'" and so long as the RFC analysis says "enough to enable review of whether the ALJ considered the totality of a claimant's limitations." *Jarnutowski v. Kijakazi*, 48 F.4th 769, 774 (7th Cir. 2022) (quoting *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018)) and citing *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021)); *see also Jeske v. Saul*, 955 F.3d 583, 595–96 (7th Cir. 2020) (finding ALJ's failure to include a function-by-function assessment of her RFC pursuant to SSR 96-8p did not require remand where the ALJ's explanation enables meaningful consideration of "whether the ALJ applied the right standards and produced a decision supported by substantial evidence").

That is the case here. Remand is not warranted because Claimant fails to demonstrate the ALJ erred in not including any other specific physical limitations in the RFC. Claimant acknowledged "the ALJ . . . did explain her reasons for rejecting unspecified '[f]urther limitations'" but asserts the ALJ's explanations do not withstand scrutiny, pointing to Claimant's need to frequently change bandages on her lesions and the pain from her lesions. [ECF No. 17] at 10-12; [ECF No. 26] at 2-4. The Court finds the ALJ considered the medical evidence regarding both Claimant's need to regularly change bandages and the effect of pain from her lesions, but ultimately found the overall record to be inconsistent with Claimant's accounts as to the duration and severity of those symptoms. (R.21-22).

First, as to the need for frequent bandage changes, Claimant says "[i]t is unclear why the ALJ thought [Claimant's] medical providers should have put the word 'bandage' in a treatment note" and asserts it is "common-sense" that bandages are needed for active lesions. [ECF No. 17] at 11. The Court is not in a position to determine what type of bandaging instructions would typically be included in medical reports. Moreover, the salient issue is how frequently bandage changes would be required and whether that task would interfere with Claimant's ability to perform work. As to that point, the ALJ was entitled to consider the absence of any reference to the need for extremely frequent bandage changes in the record. (R.21 (observing "[t]here is no mention of bandage changes as alleged"); R.21-22 (concluding "[f]urther limitations are not supported," noting Claimant "is not observed to be wearing bandages and her providers have not instructed the claimant to wear bandages.")).

12

Claimant also argues the ALJ did not consider Claimant's need for excessive breaks during the workday to frequently change bandages "when her lesions are active or infected," [ECF No. 26] at 4, and points to her testimony that "[s]he has always had active lesions for the last two years." [ECF No. 17] at 5 (citing R.131), 12 (noting "the ALJ did not point to a single dermatology visit in the record that found complete resolution of all lesions"). But the ALJ's conclusion that the record did not support Claimant's claim of "constant flare ups" of such active lesions was not unreasonable. (R.21-22). The ALJ noted "on occasion the claimant seeks treatment for a skin flare up," but also observed "her symptoms are often improved after treatment and do not last for months at a time as the claimant alleged." (R.21-22). Moreover, Claimant acknowledged "at times providers described her condition as controlled, stable or improved" and that examinations reported both "active and non-active lesions." [ECF No. 17] at 3.[6]

That Claimant did not experience periods where she was free of any lesions is not inconsistent with the ALJ's conclusion that the extent or duration of Claimant's active lesions did not require additional work limitations for excessive breaks to change bandages. To that end, the Court notes Claimant did not identify medical evidence about how long a lesion remains in an active or infected state that requires

---

[6] The ALJ noted in March 2017, Claimant's lymphomatoid papulosis was "clinically improved"; when she returned in May 2017, her symptoms were "well-controlled" and her medication dosage was decreased; in July 2017, she was "clinically improved" and her medication was reduced again. (R.21). In October 2017, she had new lesions and her medication was increased, but it was decreased again in November 2017. (R.21). In March 2018, she reported more lesions (although "overall, she was noted to have 'few' active lesions") and her medication was increased. (R.21). In July 2018, Claimant was "improved and doing well", and in January 2019 she was also reported as "stable." (R.21-22).

such constant re-bandaging. The Court "will not reweigh evidence or substitute [its] judgment for [that of] the ALJ's" regarding the frequency and duration of Claimant's active lesions and the need for frequent bandaging of those lesions. *See Zoch v. Saul*, 981 F.3d 597, 602 (7th Cir. 2020).[7]

Second, as to the pain from her lesions, Claimant does not identify the additional limitations that would be needed to accommodate her symptoms. She says "the documented painfulness of [her] lesions could reasonably be expected to produce disabling off-task behavior more than ten to eleven percent of the workday or absenteeism more than 'actually almost zero days' during a probationary period," but this appears to just parrot the vocational expert's testimony about the range of acceptable time away from work or work tasks. [ECF No. 17] at 8; [ECF No. 26] at 4. Claimant does not identify medical evidence or even cite her own testimony in support of her claim that the pain from her lesions would require so much time away from work that she would be unable to maintain employment. *See Weaver v. Berryhill*, 746 F. App'x 574, 579 (7th Cir. 2018) (that claimant must "establish not just the existence of [her] conditions, but ... that they support specific limitations affecting her capacity to work"). Given the absence of any evidence supporting Claimant's assertion that the pain from her lesions would prevent her from working, any error by the ALJ in failing to consider additional limitations due to pain was harmless. *See Jozefyk v.*

---

[7] In Reply, Claimant argues that her lesions remain for one week even when treated with Kenalog injections [ECF No. 26] at 4 n.3, but again, this does not address how long the lesions remain in an active or infected state that would require frequent breaks from work to change bandages at intervals between every ten and sixty minutes. [*Id.*] at 4.

*Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (where claimant "did not testify about restrictions in his capabilities . . ., and the medical record does not support any, there are no evidence-based restrictions that the ALJ could include in a revised RFC finding on remand").[8]

Claimant also asserts the ALJ improperly played doctor in rejecting her accounts of pain, [ECF No. 17] at 12, but the ALJ acknowledged Claimant's accounts. (R.21-22). The ALJ considered Claimant's testimony that her lesions were painful and her statements to that effect in medical visits, but also noted instances where Claimant's providers reported she was not in distress. (R.21-22 (July 2017 and June 2018 reports)). The ALJ also observed Claimant "does not appear in acute distress or exhibit pain behavior to support her allegations." (R.22). As discussed above, the ALJ discounted Claimant's account that she experiences "severe itching, burning and pain on a constant basis" because "the objective evidence of record demonstrates that the claimant does not experience constant flare-ups or papules." (R.22). In addition, the ALJ considered evidence of Claimant's daily activities such as "volunteering at an animal shelter walking dogs, looking for work, taking employment courses, going to the library, attending church and spending time with family," concluding "[t]his is not consistent with disabling limitations." (R.25).

---

[8] Claimant cites descriptions of her condition available from internet sources, including that "[s]ymptoms associated with lesions may include itching and/or pain, which may be debilitating," [ECF No. 17] at 2 n.1 & 12 (quoting https://rarediseases.info.nih.gov/diseases/6944/lymphomatoid-papulosis), but this is not evidence that Claimant herself experienced such debilitating pain.

"[A]lthough an ALJ may not ignore a claimant's subjective reports of pain simply because they are not fully supported by objective medical evidence, discrepancies between objective evidence and self-reports may suggest symptom exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Moreover, an ALJ's assessment of a claimant's credibility is entitled to deference. *See Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (an "ALJ's credibility finding is given 'special deference' by the reviewing court and is overturned 'only if it is 'patently wrong.''") (internal citations omitted). On the record here, where the ALJ considered some medical reports stating Claimant exhibited a lack of acute distress, discounted Claimant's account of the constancy of painful lesions based on evidence showing only periodic flare ups and successful treatment, and weighed Claimant's pain allegations against her ability to engage in daily activities, the Court cannot say the ALJ's analysis was not supported by substantial evidence. *See Taylor v. Kijakazi*, No. 21-1458, 2021 WL 6101618, at *3 (7th Cir. Dec. 22, 2021) (upholding ALJ's RFC assessment that "took account of objective indicators pain from the medical record, like the fact that Taylor expressed no discomfort during particular physical examinations"); *Gebauer v. Saul*, 801 F. App'x 404, 410 (7th Cir. 2020) ("The ALJ considered the evidence of [claimant's] daily activities in balance with the rest of her record, including evidence that her doctors noted 'no apparent physical distress,' even on the days when she complained of pain . . .").[9]

---

[9] The Commissioner also argues that the ALJ committed no error because she "included more limitations than any doctor of record recommended based on physical impairments" for Claimant's lymphomatoid papulosis, [ECF No. 23] at 3 (citing *Best v. Berryhill*, 730 F. App'x 380, 382 (7th Cir. 2018)). This misstates Claimant's burden. As the Seventh Circuit recently

In sum, although the ALJ did not explain how the light work and postural and environmental limitations included in the RFC accommodated Claimant's lymphomatoid papulosis, Claimant fails to show the ALJ erred in not including any other specific limitations in the RFC. The ALJ provided sufficient analysis to build an accurate and logical bridge between the evidence regarding the severity and duration of Claimant's lymphomatoid papulosis symptoms and the ALJ's decision not to include further limitations to address Claimant's need to take frequent breaks for bandaging or to take time off of work due to pain from active lesions. The Court cannot reweigh the evidence and is limited to considering whether substantial evidence supported to the ALJ's conclusion. "Substantial evidence includes 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In making this determination, the Court must review the record as a whole, and it cannot substitute its judgment for that of the ALJ. *Id.* On this record, the Court concludes there was substantial

---

explained, Claimant's burden "was to produce medical evidence, not an opinion." *Greer v. Kijakazi*, No. 22-2548, 2023 WL 4540472, at *4 (7th Cir. July 14, 2023) (rejecting Acting Commissioner's argument "that substantial evidence supported the ALJ's decision because the claimant had offered 'no opinion from any doctor to set ... limits ... greater than those the ALJ set'"); *see Gedatus v. Saul*, 994 F.3d 893, 904–05 (7th Cir. 2021) (claimant "bears the burden to prove she is disabled by producing medical evidence"). Accordingly, the relevant issue is not the absence of an opinion imposing greater limitations due to Claimant's lymphomatoid papulosis but rather whether the medical evidence as to bandaging and pain supported further limitations. As addressed above, the Court finds the ALJ's conclusion that the evidence did not support further limitations was supported by substantial evidence.

evidence supporting the ALJ's rejection of further limitations to accommodate Claimant's lymphomatoid papulosis and remand is not warranted on this basis.[10]

### B) The ALJ's assessment of the testifying medical expert's opinion as to Claimant's mental health limitations was adequately supported by substantial evidence.

Claimant also argues the ALJ erred in finding the opinion of a testifying psychologist (Dr. Ricardo Buitrago) to be persuasive without adequately explaining the supportability and consistency of that opinion with the record evidence. [ECF No. 17] at 13-15.

Claimant filed her claim after March 27, 2017, meaning under the revised regulations, the ALJ no longer gives "specific evidentiary weight, including controlling weight, to any medical opinion(s) ... including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the most important factors in evaluating any doctor's opinion are supportability and consistency. *Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022); 20 C.F.R. § 404.1520c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."). Other factors to be considered in the ALJ's evaluation include the relationship with

---

[10] Although Claimant briefly noted, in a one sentence footnote, that the ALJ did not include limitations on reaching and manipulation in the RFC, in her Reply she clarifies that she is not arguing such limitations were erroneously excluded from the RFC (as related to her carpal tunnel syndrome. *See* [ECF No. 17] at 10 n.3; [ECF No. 26] at 2 n.1. In addition, Claimant has not identified any medical evidence related to carpal tunnel syndrome that she contends the ALJ failed to adequately consider. Accordingly, the Court does not address whether the RFC adequately accommodated this condition.

the claimant, specialization, and other factors that tend to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. §§ 404.1520c(a), (c). But the ALJ's decision must only explain how she considered the factors of supportability and consistency – she is not required to explain how she evaluated the other factors. 20 C.F.R. § 404.1520c(b)(2). The ALJ need only "minimally articulate [her] reasons for crediting or rejecting" each opinion. *Clifford v. Apfel*, 227 F.3d 836, 870 (7th Cir. 2000).

In addition, an ALJ may permissibly rely on a testifying medical expert in assessing a claimant's work limitations. *McGillem v. Kijakazi*, 2022 WL 385175, at *4 (7th Cir. 2022)). "An ALJ may obtain a medical expert's opinion for several reasons, including to clarify and explain the evidence or help resolve a conflict because the medical evidence is contradictory, inconsistent, or confusing and to determine the claimant's residual functional capacity." *Apke v. Saul*, 817 F. App'x 252, 256-57 (7th Cir. 2020) (quoting *Gebauer v. Saul*, 801 F. App'x 404, 408 (7th Cir. 2020)). Moreover, "the use of a medical expert can help ALJs resist the temptation to 'play doctor' ... by evaluating medical evidence on his or her own." *Id.*

As noted above, there were three medical opinions addressing Claimant's mental health in the record – two state assessments and the opinion of an independent medical expert, a psychologist, who testified at the hearing (Dr. Buitrago). (R.25). The state assessments "opined that [Claimant's] impairments are nonsevere" and warranted no limitations, and the ALJ found them "somewhat persuasive." (R.25 (citing Exs. C1A; C2A; C5A; C6A)). The ALJ concluded, however,

the testifying psychologist's opinion finding Claimant had some mental limitations was "better supported" and therefore Claimant was "given limitations as a precaution." (R.25). Specifically, the ALJ found Dr. Buitrago's opinion that Claimant "could understand simple instructions, engage in simple repetitive tasks and make simple, work-related decisions" to be persuasive because it was "supported by the record, including [Claimant's] conservative treatment, mental status exams and her ability to volunteer, visit the library and take employment courses." (R.25).

The ALJ's analysis met the requirement to "minimally articulate" her reasoning for finding Dr. Buitrago's opinion persuasive. In considering the requirement to address the supportability and consistency of a medical opinion, courts have found an ALJ failed to adequately explain why the ALJ gave a testifying expert's opinion great weight where the ALJ stated the opinion was "well supported by the record" without any additional explanation and otherwise only referenced the record evidence in the Step Three analysis. *See Angela I. v. Kijakazi*, 2023 WL 6126755, at *2 (N.D. Ill. Sept. 19, 2023) (holding ALJ's evaluation of expert's opinion was not supported by substantial evidence because ALJ did not explain her finding and "used no connecting language to describe how the recited evidence purportedly supported [the expert's] opinion"). By contrast, here, the ALJ included a detailed discussion of the record evidence as to Claimant's mental health and concluded "her mental status exams do not show significant deficits, she is treated conservatively, she is on moderation medication dosages, she focuses on situational stressors, she has

not been hospitalized and she is active, looking for work and volunteering at an animal shelter." (R.22).

The ALJ also noted one instance where Claimant's condition had improved when her dosage of a medication (Wellbutrin) was increased. (R.23-24 (discussing report from May 2018)). The ALJ determined "[g]iven all of the foregoing, the claimant has been limited to simple routine tasks requiring no more than short simple instructions and simple work related decision making with few workplace changes" which the ALJ stated was "supported by the opinion of the medical expert, her mental status exams, volunteer activity, conservative treatment and stability on medications." (R.24). In the Court's view, the ALJ's evaluation of Dr. Buitrago's opinion provided sufficient connecting language to the supporting evidence, including by referencing the Claimant's history of conservative mental health treatment, her mental status exams, and her ability to engage in daily activities. (R.22-24).

Claimant also argues the ALJ failed to explain how Dr. Buitrago adequately supported his opinion that Claimant's mental health symptoms were only mild to moderate in light of certain purported factual errors in his testimony. [ECF No. 17] at 13. Specifically, Claimant says Dr. Buitrago testified that Claimant was only prescribed a moderate dose of Wellbutrin (300 milligrams) when the record actually showed Claimant's dose had increased to 450 milligrams in November 2018. [*Id.*]

The Court disagrees with Claimant's characterization of Dr. Buitrago's testimony. As an initial matter, although Dr. Buitrago testified "[f]olks who are more pronounced or severe or unstable depressive symptoms generally go all the way up to

450, sometimes at 500," (R.141), he did not say Claimant had never been prescribed such a dose. (R.141). Instead, Dr. Buitrago testified Claimant had "been at 300 for quite some time" (*id.*) – a factually accurate description, as Claimant had been prescribed Wellbutrin at a dose of 300 mg or less before November 2018. *See* [ECF No. 23] at 11. Moreover, the record reflects that Dr. Buitrago found Claimant's symptoms were effectively managed by her medication. Claimant acknowledges that Dr. Buitrago testified that Claimant's treating physician found her symptoms were "more pronounced" in November 2018. [ECF No. 17] at 13. Although Dr. Buitrago did not specifically mention the Wellbutrin dosage increase that month, he observed that Claimant's physician reported her symptoms had stabilized by the following month, as well as in all subsequent months. (R.141-42).

The ALJ similarly discussed Claimant's improved mental health condition in the months following the increased dose, noting Claimant volunteered to walk dogs in December 2018; went on job interviews in January 2019; took computer classes and had enrolled in an employment training program in February 2019, and "had appropriate appearance, was happy, upbeat and calm with cooperative demeanor"; was in her fourth week of a federal work readiness program in April 2019, and was looking for work in May 2019. (R.24). The ALJ also found Claimant's "stability on medications" supported the limitations in the RFC. (R.24).[11] Thus, the ALJ's failure to specifically address the supportability of Dr. Buitrago's opinion in light of

---

[11] Claimant does not dispute Commissioner's cited authority that the ALJ was entitled to rely on medical evidence that the condition is controlled by medication. [ECF No. 23] at 11-12 (citing *Truelove v. Berryhill*, 753 F. App'x 393, 397 (7th Cir. 2018)).

Claimant's increased dose of Wellbutrin in November 2018 is, at best, harmless error. *See Butler v. Kijakazi*, 4 F.4th 498, 504 (7th Cir. 2021) (error is harmless when review of the record allows a court to "predict with great confidence what the result of remand will be," citing *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)).

Claimant's other criticisms of Dr. Buitrago's opinion improperly call for the Court to reweigh the evidence. For example, Claimant criticizes the ALJ for failing to discuss the record support for Dr. Buitrago's opinion that Claimant's mental health symptoms were mild to moderate and only acknowledging more pronounced symptoms on one occasion. [ECF No. 17] at 13-14. Specifically, Claimant says Dr. Buitrago focused only on Claimant's worsened condition in November 2018 while apparently overlooking treating physician reports showing her mental health state had declined on other occasions (specifically, in April 2017, December 2017, and March 2018), and that he failed to address all of Claimant's reported mental health symptoms. [ECF No. 17] at 13-14.

The ALJ's opinion demonstrates that she considered evidence about Claimant's symptoms, including specifically in April 2017, December 2017, and March 2018, albeit without giving those reports the same weight as Claimant urges now. For instance, the ALJ described medical reports from April 2017 as stating "claimant was homeless and living in her car" and that she reported a "sad mood" and had "constricted affect" while also being "fully oriented with normal behavior and speech," with "no suicidal ideation, intact cognition and fair judgment and insight." (R.22). In December 2017, the ALJ stated reports showed Claimant "had some

increased sadness after a motor vehicle accident and family discord" but did not want to increase her Wellbutrin dose and that she "was also encouraged to restart therapy." (R.23). In March 2018, the ALJ noted Claimant "was assessed with some chronic low grade depressive symptoms" and that "[s]he was to continue her current medication and therapy and consider adding low dose Risperdal." (R.23). The ALJ also noted Claimant's Wellbutrin dose was increased later in March 2018 and that by May 2018 she had "improved with the increased dosage" and "reported it reduced crying to once per week." (R.23). Accordingly, although the ALJ did not specifically discuss this evidence in connection with her evaluation of Dr. Buitrago's opinion, it is evident that the ALJ considered Claimant's increased symptoms on these occasions and found the overall record still supported the conclusion that Claimant's symptoms were moderate and stable with medication.

Claimant also contends the ALJ inadequately analyzed the consistency of Dr. Buitrago's opinion with the record evidence because the ALJ relied on "Dr. Buitrago's cherry-picked findings" which purportedly did not address Claimant's symptoms of "crying, tearfulness, thinking of giving up, not want to be 'here', lacking concentration, self-isolating, experiencing palpitations and shortness of breath, and problems with sleep and appetite." *See* [ECF No. 17] at 14. The Court disagrees. The ALJ acknowledged reports of Claimant's "sad mood," "constrained effect," "crying some nights," "increased sadness," "poor sleep," "dysphoric mood," and "feeling irritable and down." (R.22). But the ALJ also observed improvement in those symptoms on other occasions. (R.22-24). The ALJ noted several medical reports in

24

April 2017, October 2017, December 2017, and May 2018 stated Claimant did not have suicidal ideation. (R.22-24). With respect to Claimant's appetite, at step two, the ALJ discussed Claimant's low body mass index and referenced a nutritional assessment from March 2017 showing she was eating minimally, but observed the diagnosis was due to her homeless status, which caused a lack of financial resources and limited access to food and places to cook. (R.18). Relatedly, the ALJ noted instances in the record where Claimant's eating and sleep improved when she had access to food and shelter. (R.18; R.22-24). The ALJ also found Claimant "focused on situational stressors" (which the ALJ observed in several instances coincided with reports of increased symptoms, *see* R.22-24) and ultimately concluded "[h]er main issue is homelessness." (R. 22; *see also* R.25 ("Overall, claimant is homeless, but this is not a factor in the finding of disability.")).

In the Court's view, reevaluating the evidence to determine whether Claimant's mental health symptoms should be characterized as generally moderate and controlled with medication, or on occasion more severe, would improperly require the Court to reweigh the evidence. "[I]t is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome." *Bakke v. Kijakazi*, 62 F.4th 1061, 1068 (7th Cir. 2023).

Perhaps more importantly, Claimant does not identify medical evidence supporting any additional mental health limitations beyond those articulated by Dr. Buitrago and incorporated by the ALJ into the RFC. *See Gedatus*, 994 F.3d at 905 (claimant "has not pointed to any medical opinion or evidence to show any [mental

impairments] caused any specific limitations"); *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (plaintiff's argument for further restrictions failed due to plaintiff's failure to identify medical evidence justifying further restrictions). For instance, Claimant does not explain why Dr. Buitrago's opinion that Claimant could understand simple instructions and engage in simple repetitive tasks and the corresponding limitations in the RFC (limiting Claimant to performing "work that involves simple routine tasks requiring no more than short, simple instructions", *see* R.19) were insufficient to account for Claimant's lack of concentration. [ECF No. 17] at 14. "Medical evidence supports the existence of the condition, but the need for restrictions cannot be inferred from the diagnosis alone." *See McGillem v. Kijakazi*, 2022 WL 385175, at *4 (7th Cir. Feb. 8, 2022) (ALJ permissible relied on testifying expert's assessment of claimant's work limitations where assessment was not contradicted by any treating sources and claimant "does not state what (if any) further restrictions would be appropriate, or what evidence there is to support specific further limitations" and only "refers generally to time off-task and the need for frequent unpredictable breaks, but he does not quantify these limitations or show why they are work-preclusive").[12]

---

[12] Claimant offers no support for her assertion that the ALJ improperly conflated daily living activities with the ability to perform full time work. [ECF No. 17] at 14. To the contrary, the ALJ's discussion of Claimant's abilities was not limited to "activities of daily living" but rather focused on her ability to perform job tasks as a volunteer, including walking dogs, and her participation in computer classes and job training programs. (R.24-25).

For these reasons, the Court concludes the ALJ's opinion finding Dr. Buitrago's testimony persuasive was supported by substantial evidence and denies Claimant's request for remand on this basis as well.

## CONCLUSION

Accordingly, for all of the reasons set forth in the Court's Memorandum Opinion and Order, Claimant's Motion for Summary Remand [ECF No. 17] is denied, and the Commissioner's Motion for Summary Judgement [ECF No. 23] is granted.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:    October 2, 2023